**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DAVID FREIFELD, NITAYA MCGEE, and HANNAH SMITH**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**EPSILON DATA MANAGEMENT, LLC,**<br><br>Defendant. | Case No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs David Freifeld, Nitaya McGee, and Hannah Smith ("Plaintiffs") bring this class action complaint ("Complaint") on behalf of themselves and a class of similarly situated California residents (the "Class Members") against Epsilon Data Management, LLC ("Epsilon" or "Defendant") for violations of federal law and the laws of Illinois and California with regard to the unauthorized collection, recording, and dissemination of Plaintiffs' and Class Members' personal information, geolocation data, addressing information and confidential communications from hundreds or thousands of websites and mobile applications. The allegations contained herein, which are based on Plaintiffs' knowledge of facts pertaining to Plaintiffs' own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. Epsilon is an advertising and software company and data broker[1] known for its massive database of consumer data, which is obtained by tracking hundreds of millions of

---

[1] https://oag.ca.gov/data-brokers?combine=epsilon+data+management%2C+llc.

Americans across various websites and apps. This information is combined into detailed profiles on each consumer and sold for a profit.

2.  Epsilon's business model relies on intercepting and collecting massive amounts of highly sensitive data, including names, addresses, contact info, health conditions, financial information, ideological and propensity information, and precise geolocation data, from consumers' mobile devices and then selling and utilizing that data as part of its advertising business. All without consumers knowledge or consent.

3.  Every second of every minute of the day, ordinary citizens are being spied on by companies like Epsilon, and their data is being collected, shared, sold, and monetized alongside their identities, all without their knowledge or consent.

4.  People use their mobile phones and computers throughout the day by checking various websites and mobile phone apps, such as the weather, local news, and traffic conditions before even starting their commute to work or school. Within a matter of 10 minutes, an individual can easily have visited several websites and used three or four different mobile applications.

5.  By lunch, a person could have read the latest political news, searched for over-the-counter medications to treat medical conditions, and logged into their retirement account. In the afternoon, they may be running errands around town, such as visiting a church or place of worship, stopping at a pharmacy to pick up a monthly prescription, or having to slam on the brakes after getting cut off in traffic. When at home, the person may search for their teen's whereabouts using a family safety app, shop online and place an order, and search for "low-carb recipes" while making dinner.

6.  Each step of the way, every single interaction—whether done on a website, in an app, or simply by carrying a smartphone in a purse or pocket—is intercepted, tracked, repackaged

and monetized by a billion-dollar industry that citizens are unaware of, and have little to no control over.

7. The highly-sensitive information and data Epsilon intercepts, collects, tracks ad aggregates—such as one's religious beliefs, place of worship, political beliefs, medical conditions, immigration status, financial well-being, income, and more—is not captured simply for the sake of data collection.

8. Instead, Epsilon aggregates innumerable datapoints concerning hundreds of millions of unique consumer profiles in order to make them and the underlying behavioral and location data available to the highest bidder for a wide variety of uses. For example, Epsilon makes its data available to clients who then use its voluminous data to place and deliver highly specific micro-targeted advertising for products and services; to insurance companies to assess driving behavior and raise insurance premiums, even when no claim has been made; by health insurers to infer consumers' actual medical conditions raise their coverage premiums; and even by federal agencies that have been caught buying up troves of information that would be unavailable to the government without first obtaining a search warrant.

9. Consumers' personal information—particularly sensitive personal information and detailed movement data—must be protected. As the Supreme Court recognized in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), location data is highly sensitive, not just because of what the data point alone says about an individual (*i.e.*, where they were at a particular time), but also because of the massive amount of personal information that can be extracted from location data (such as medical treatment, personal relationships, and private interests). As Chief Justice John Roberts stated, "a cell phone—almost a 'feature of human anatomy[]'—tracks nearly exactly the movements of its owner . . . . A cell phone faithfully follows its owner beyond public

3

thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," and when a third-party has access to the information stored on one's cell phone, that entity "achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id*. at 2218 (internal citations omitted).

10. Epsilon is one of the largest offenders in this insidious world of covert data collection and resale. The data that Epsilon collects from unsuspecting consumers via various tracking technologies, such as cookies, pixels and various Software Development Kits ("Tracking Tools") is incredibly invasive, particularly when collected alongside timestamped geolocation data that reveals where a person lives and works, which locations they frequent, their religious affiliation, medical conditions, sexual orientation, and more.

11. In addition to information it collects directly through tracking technologies, Epsilon receives a constant stream of similarly sensitive information from consumers' use of websites and apps where its partners are tracking similar behavioral, transactional and location data, which it then further supplements with information gleaned from public sources of purchase outright from other data brokers.

12. Using this seemingly endless stream of information, Epsilon has constructed a massive database containing grotesquely detailed profiles of over 255 million US consumers (3/4 of the US population), which Epsilon uses for its own benefit, including the sale to third parties and advertising purposes. Most troublingly of all, these profiles are not associated with mere mobile devices or anonymous online user handle. Each profile is associated with a "COREid" assigned by Epsilon, an identifier unique to each user and associated with their real-world names, address, email addresses and more. As Epsilon boasts on its website, each COREid "is privacy-protected and never changes. Even if [consumers] get a new phone, a new job, move across the

country and start going by a cool nickname, their profile keeps up with all these changes—so they're always reachable across all their channels and devices for years."

13. As a result of Epsilon's conduct, Plaintiffs and Class Members have suffered numerous injuries, including invasion of privacy, loss of benefit of the bargain, diminution of value of their Private Information, statutory damages, and the continued and ongoing risk to their Private Information. Consequently, Plaintiffs brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a different state than Epsilon. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, *et seq.* (the Electronic Communications Privacy Act).

15. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

16. Defendant has stipulated the existence of specific personal jurisdiction within Illinois. Further, this Court has personal jurisdiction over Defendant because Epsilon purposefully directed its activities to Illinois and availed itself of the privilege of conducting its relevant business within Illinois. Epsilon's activities in Illinois also form the basis for Plaintiffs' Complaint. Epsilon's largest office is in Chicago, and it is registered to conduct business in Illinois. Illinois is the location of Epsilon's privacy and data collection services. Epsilon's senior leadership and decision-makers driving Epsilon's data collection, aggregation, and analytics services are located

5

in Epsilon's Chicago office. Epsilon's President and Chief Operating Officer, the Chief Analytics Officer, the Chief Technology Officer, the head of the North America Privacy group, as well as the Data Partnerships team and the employees responsible for building the CoreID and consumer profiles alleged to be at issue are located in Chicago.

17. Venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and Plaintiffs resides in this District.

## THE PARTIES

18. Plaintiff David Freifeld is an adult citizen and resident of the State of Illinois and is domiciled in Vernon Hills, Illinois.

19. Plaintiff Nitaya McGee is an adult citizen and resident of the State of California and is domiciled in Riverside, California.

20. Plaintiff Hannah Smith is an adult citizen and resident of the State of California, and is domiciled in North Hills, California.

21. Epsilon Data Management LLC is a Delaware limited liability company. Epsilon engages in business across the United States, including within Illinois.

## FACTUAL ALLEGATIONS

### A. Data Brokers and Real-Time Bidding: The Information Economy

22. To put the invasiveness of Defendant's privacy violations into perspective, it is important to understand three concepts: data brokers, real-time bidding, and cookie-syncing.

a. **Data Brokers**

23. While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[2] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

24. Any entity that qualifies as a "data broker" under California law must specifically register as such (Cal. Civ. Code § 1798.99.82(a)), which Epsilon does.[3]

25. "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[4] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data." And whereas individual data sources "may provide only a few elements about a person's activities, data brokers combine these elements to form a detailed, composite view of the consumer's life."[5]

26. For instance, as a report by NATO found, data brokers like Defendant collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been

---

[2] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (2021), https://techpolicy.sanford.duke.edu/wp-content/uploads/sites/4/2021/08/.
Data-Brokers-and-Sensitive-Data-on-US-Individuals-Sherman-2021.pdf.
[3] DATA BROKER REGISTRATION FOR EPSILON DATA MANAGEMENT, LLC, https://oag.ca.gov/data-brokers?combine=epsilon
[4] SHERMAN, *supra*, at 2.
[5] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what consumers may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[6]

27. Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[7] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[8]

28. This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[9]

29. As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has

---

[6] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/
cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[7] SHERMAN, *supra*, at 1.

[8] *Id.*

[9] *Id.* at 9.

> identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[10]

30. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving consumers of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[11]

---

[10] *Id.*

[11] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.



*Figure 1. Screenshot taken from Nato Report.[12]*

31.     Data brokers like Defendant are able to compile such wide swaths of information in part by collecting users' IP addresses and other device information, which is used by data brokers like Defendant to track users across the Internet.[13] Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[14]

32.     These data brokers will then:

---

[12] TWETMAN, *supra*, at 8.

[13] *Id.* at 11.

[14] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[15]

33. In short, data brokers like Defendant track consumers across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

**b. Real-Time Bidding**

34. So, once data brokers like Defendant collects information from consumers and create comprehensive user profiles, how does Defendant "sell" or otherwise monetize that information? This is where real-time bidding comes in.

35. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[16]

36. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP "work[s] with website or app publishers to help them participate in the RTB process." "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[17] And an Advertising Exchange "allows advertisers and publishers to use the same

---

[15] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[16] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[17] Geoghegan, *supra*.

technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[18]

37. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

38. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[19]

---

[18] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[19] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.



*Figure 2. Screenshot taken from AppsFlyer.[20]*

39.　Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about consumers to procure the greatest interest from advertisers and obtain the highest bids for website and app operators' users. But these SSPs and DSPs receive assistance by connecting with Data Management Platforms ("DMPs") or data brokers like Defendant:

> the economic incentives of an auction mean that DSP with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or data broker, like Defendants]. DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[21]

---

[20] https://www.appsflyer.com/glossary/real-time-bidding/.

[21] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.



*Figure 3. Screenshot taken from Perion.*[22]

40.     In other words, before bidding to show a user an advertisement, SSPs and DSPs will attempt to determine what other information about a user may be available. SSPs and DSPs do this by connecting with entities like Defendant, that match a consumer's information from a particular website or mobile application (*e.g.*, their IP address) with any profiles on those users Defendant may have compiled. If there is a match, then advertisers will pay more money to show users an advertisement because the advertisers have more information to base their targeting on. This naturally enriches website and app operators, as their users are now more valuable. It also enriches SSPs who can offer users to advertisers for more money based on the greater number of traits available, and DSPs who can receive higher bids for the same users. And SSPs and DSPs can continue linking users on a website or mobile application through the Advertising Exchange, which enhances the SSP's and DSP's ability to better identify users in the future and helps the SSP and DSP profit further as well.

---

[22] https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

41.     As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a)     "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, website and app operators] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b)     "send[ing] sensitive data across geographic borders."

(c)     sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[23]



*Figure 4. Screenshot taken from Brave on Real Time Bidding.[24]*

---

[23] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[24] https://brave.com/rtb-evidence/.

42. The last point bears additional emphasis, as it means the data Defendant provides to DSPs to serve targeted advertisements is even provided to those entities who do not actually serve an advertisement on a consumer. This greatly diminishes the ability of users to control their personal information.

43. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[25]

44. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[26]:

45. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one statutes like the CIPA were enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

c. **Cookie Syncing**

46. It should now be clear both the capabilities of data brokers like Defendant who de-anonymize users, and the reasons that Defendant's technology is installed on websites (to provide

---

[25] Geoghegan, *supra*.
[26] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

more information to advertisers in real-time bidding. The final question is how does Defendant share information with other services to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

47. Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[27] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[28]

48. Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

> …

> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order

---

[27] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[28] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[29]



*Figure 5.*

49. Through this process, third party trackers like Defendant are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[30]

50. On the flip side, "CSync may re-identify web users even after they delete their cookies."[31] "[W]hen a user erases her browser state and restarts browsing, trackers usually place

---

[29] Papadopoulos, *supra*, at 1433.
[30] Papadopoulos, *supra*, at 1434.
[31] *Id.*

18

and sync a new set of userIDs, and eventually reconstruct a new browsing history."[32] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[33]

51.      Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[34]

52.      Cookie syncing is precisely what is happening here. When Defendant's Pixels are installed on users' browsers, they are syncing their unique user identifiers with other third parties on the websites (*e.g.*, the Partner Pixels listed below). The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from being anonymous when they visit websites.

*      *      *

53.      To summarize the proceeding allegations, Defendant is a data broker that focuses on collecting as much information about users as possible to create comprehensive user profiles. Through "cookie syncing," those profiles are shared by Defendant with other entities (and vice versa) to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interest advertisers through real-time bidding, where users will command more value the more advertisers know about a user. Thus, Defendant enriches the value that website users would otherwise command by tying the data they obtain directly from users on

---

[32] *See id.*
[33] *Id.*
[34] *Id.* at 1441.

websites with comprehensive user profiles in their possession or in the possession of other entities they sync with.

54. Accordingly, Defendant is using its tracking technology in conjunction with website operators and other third parties to (i) de-anonymize users, (ii) offer users up for sale in real-time bidding, and (iii) allow website operators to monetize websites by installing Defendant's Pixels and allowing the Defendant to collect as much information about users as possible (without consent).

55. Of course, Defendant also benefits from this arrangement because websites and apps will want to employ Defendant's services to bring in more advertising revenue, meaning Defendant can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of Defendant's services.

56. As it stands though, Defendant is already one of the largest players in this industry. Defendant achieved this status using a variety of technologies and services, as described below.

**B. Epsilon's Collection and Use of Consumer Data**

57. Epsilon proudly advertises its database of 250 million U.S. consumers, which it uses to deliver targeted advertising on behalf of its business partners.

## Why Epsilon data



*Figure 6: Screenshot taken from Epsilon's website.[35]*

58.     Epsilon collects the information for this database from what it describes as "ethical" and "transparent" sources, such as public records (*e.g.*, phone books, voter registration, deeds, and permits), self-reported data from surveys, data from partners, and "real transactional data on competitive and channel spend and category purchases." However, Epsilon merely uses these sources as the foundation for the highly-detailed profiles it has built of more than 250 million consumers—what Epsilon refers to as "COREid." Epsilon ultimately supplements and builds out each COREid using data it acquires through various illicit means and absent consumers' consent, by using both Epsilon's proprietary Tracking Tools and by soliciting consumer data from third parties, all to further enrich its "#1 ranked consumer database."

59.     Epsilon assigns each user a "Dotomi ID," which is associated with the cookies loaded on the individual's browser and is designed to follow them across the internet and mobile apps.

60.     To further identify and track individuals, Epsilon tracks user's email addresses entered into websites with its Tracking Tools.

---

[35] https://www.epsilon.com/us/products-and-services/data.

21

61.     Epsilon builds its COREid product from deterministic identity data—persistent identifiers unique to individual consumers, including names, and physical and email addresses—and probabilistic identity data (connecting individual data points from disparate sources such as device and browser usage, to probabilistically identify a user).

62.     Each individual COREid profile starts with each consumer's full name, physical addresses, email addresses, and phone numbers.[36] Indeed, Epsilon touts the fact that unlike some competing identity resolution products, COREid utilizes every major persistent identifier rather than only email addresses, ensuring a consumer's "offline identity [is] established . . . ."[37]

63.     Epsilon then supplements those profiles by locating and linking other data, such as probabilistic identifiers associated with particular consumers, such as mobile device IDs (MAIDs)—which identify unique mobile devices—and IP addresses, all of which it collects through various Tracking Tools (as elaborated upon below). These probabilistic identifiers are then aggregated alongside deterministic identifiers and, together, serve as the base of each COREid.

64.     Each COREid is "built on" and updated constantly with "data and integration from over 14,000 partner publishers including popular websites and apps that hundreds of millions of people engage with every day.[38]

---

[36] https://www.epsilon.com/us/products-and-services/identity-core-id?tab=casestudies.
[37] https://www.epsilon.com/us/insights/blog/digiday-top-id-alternatives.
[38] https://www.epsilon.com/us/products-and-services/identity-core-id?tab=casestudies .

65. With the COREid established, Epsilon is able to track consumers' online behavior across the internet and all associated devices by "connect[ing] digital signals to that foundation" to ensure its customers are able "to identify real, relevant consumer activity online."[39] It does so in a variety ways, including the use of Tracking Tools and server-side tracking, through which it avoids privacy protections that might otherwise hamper its data collection efforts.

> # Then each person gets a COREid.
>
> A COREid is privacy-protected and never changes. Even if they get a new phone, a new job, move across the country and start going by a cool nickname, their profile keeps up with all these changes—so they're always reachable across all their channels and devices for years.
>
> **Watch the video** (▶)

*Figure 7.*

66. Indeed, Epsilon even advertises that it is able to continue to track and amass data on individuals even when that person engages in conduct that would otherwise defeat tracking devices, such as obtaining a new device, changing names, or moving:

67. Specifically, Epsilon uses the following Tracking Tools to intercept and transmit directly to itself behavioral data, location data and other PII each time consumers use a website in which the Tracking Tools are embedded.

68. **Dotomi Cookies.** Dotomi Cookies are small text files that websites place on a user's web browser to collect data about their online activities. These files contain data that allows websites to track users' behavior across different websites. Tracking cookies are a type of persistent identifier wherein the identifier itself is stored within the cookie, thereby enabling websites to recognize and differentiate individual users. When a user visits a website, it may set

---

[39] https://www.epsilon.com/us/insights/blog/digiday-top-id-alternatives.

23

both first-party cookies and third-party cookies on the user's web browser. Importantly, users cannot merely "opt-out" of cookies, as is often suggested by consent banners and ad blockers, especially when concerning first-party cookies which are often designed to bypass user's attempts to avoid tracking cookies.

69.     Tracking cookies can collect, process, and share all kind of sensitive data from users, including: search and browser history; language preferences; IP address; on-site behavior like link or button clicks, pages visited, time spent on page; past purchases; search phrases; browser type; screen resolution; ads seen and interacted with; and more.

70.     The full scale of Epsilon's tracking efforts using cookies is known only to Epsilon, as it has not disclosed the full scale of its tracking efforts and tracking partners. At a minimum, Epsilon's current tracking efforts include its Dotomi trackers and the associated cookies.

71.     The process works similarly on mobile applications. Each individual and each device used by an individual are assigned a unique identifier, similar to the Dotomi ID associated with browser cookies. These identifiers are shared with other entities on mobile applications to facilitate real-time bidding auctions and to bolster the partner entities' own profiles of each individual.

72.     **Tracking Pixels.** A pixel, which may also be referred to as a "tracking pixel," "web bug," "clear GIF," or "web beacon," is a type of invisible tracking tool embedded in a website or an email to track a user's activities. Epsilon refers to its tracking pixels as JavaScript tags, or tags.[40] JavaScript tags are snippets of code that function as a type of invisible tracking tool embedded in a website to track a user's activities and serve advertisements if and when certain criteria are met.

---

[40] *Epsilon Legal*, Epsilon, https://legal.epsilon.com/us/media-service-order ("'Tag' means code (e.g., HTML) or a web beacon (e.g., pixel tag, clear GIF) (a) that requests the delivery of Advertising or tracks an Advertising impression or click, or (b) on a website that enables the collection of information about a person's interactions with that website.").

73. **Internet Protocol (IP) Address.** An IP address is a unique numerical label assigned to each device connected to the internet, acting as its digital "home address" for communication. Significantly, an IP address contains geographical location information from which the State, city and ZIP code of a specific device can be determined. While IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible. If an individual is not actively sending data packets out, the IP address remains private and is not broadcast to the wider internet.

74. IP addresses are unique and device-specific identifiers. It is for that reason that an IP address is considered "personally indefinable information" under the Health Insurance Portability and Accountability Act (HIPAA). HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

75. Knowing a device's IP address, and therefore the user's geographic location, provides a level of specificity previously unfound in marketing. An IP address allows advertisers to target customers by countries, cities, neighborhoods and ZIP code. Even more specifically, it allows advertisers to target specific households, businesses and even individuals with ads. By targeting specific households or businesses using an IP address, a company increases the likelihood that an ad is seen by their target audience.

76. In fact, Epsilon utilized IP addresses to determine consumers' exact location, and their movements over time, using a process called "Reverse IP lookup." Reverse IP lookup is a process by which the geographical location of an internet-connected device is identified by querying databases that map IP addresses to specific locations. This process involves several steps.

77. Internet Service Providers (ISPs) assign IP addresses to their customers and maintain records of which addresses are allocated to specific regions.

78. In turn, various organizations, such as MaxMind, compile these records into extensive databases, which are regularly updated using ISP data, WHOIS records (providing information about domain name and IP address ownership), and geolocation services. These databases also may incorporate Wi-Fi data collected through "wardriving," where vehicles equipped with specialized equipment drive around cities to capture data on Wi-Fi networks and their locations. This Wi-Fi data helps improve the accuracy of IP-to-location mappings.

79. In the context of cellular connections, reverse IP lookup determines a mobile device's precise location by cross-referencing the IP addresses assigned by mobile carriers against the above-referenced databases in order to identify a device's exact location.

80. Epsilon's various Tracking Tools generate precise geolocation data in this very fashion even when a device's location services are disabled. When Epsilon intercepts a device's IP address through its various Tracking Tools, it cross-references the address against the MaxMind database to generate longitudinal and latitudinal coordinates that reflect the device's precise location.

81. The resulting location data is then associated with the various other identifiers it has accumulated concerning that device from Tracking Tools, its partners, and other sources to further fingerprint users without their consent, just as it does when location services are enabled on a device. This geolocation information is then aggregated into Epsilon's COREid profiles, facilitating even more accurate fingerprinting than is possible using only device identifiers.

82. **Software Development Kits.** Software Development Kits ("SDKs") are pre-code software bundles that mobile application ("app") developers often use to minimize development

work (instead of writing the entire app code from scratch) and to create a predictable stream of income that grows as more people use the app. The header bidding API[41] and the Server-to-Server API (SSAPI)[42] are both components of the SDK that Epsilon offers to facilitate its CORE Private Exchange on mobile applications.

83.     App developers embed SDKs into their apps that the developer did not themselves create and, therefore, may not know the full extent and function of the code in the SDK. Some SDKs, unbeknownst to consumers, siphon consumers' location data directly to a data broker or advertising platform, which can even include the ability to track users' locations through public Bluetooth beacons, which enable fine-grained tracking indoors.

84.     Other tracking efforts engaged by Epsilon include: Identity resolution services that integrate data (hashed emails, transaction data, etc.) from third-party cookies and pixels to enable cross-site tracking (with or without the use of cookies) and cross-device tracking (using MAID and other device-specific identifiers such as IDFV and IDFA).

85.     Epsilon also supplements the data it collects surreptitiously with data transmitted directly to it by its "partners," companies whose websites and apps transfer data directly to Epsilon's servers, referred to as "server-side tracking." "Server-to-server tracking," as it is sometimes also known, functions as a work around so that, even if third-party tracking cookies become wholly obsolete or are otherwise blocked by the consumer, online marketers can still identify individual websites visitors and/or app users. As the name implies, the communications flow from the website owner or app developers server to another server. Epsilon itself offers "server-side" tools including through its SSAPI (server to server API) and its SharedID with

---

[41] https://publishersupport.conversantmedia.com/integrations/header-bidding.
[42] https://publishersupport.conversantmedia.com/integrations/ssapi-full.

Reverse Proxy solutions[43], both of which integrate and further inform the CoreID identity resolution product.

86.     Epsilon's SSAPI (server to server API)[44] is one such example of a server-side tracking tool—the company describes the offering as a "lightweight API integration that allows multiple apps and SDK versions to access our demand directly." The SSAPI, as well as the other server-side Tracking Tools process the various forms of identity data that they receive from publishers (such as MAIDs, cookies, tags, hashed IDs, and more) to determine the identity of the device and/or user, and track that device or individual for use in advertising by assigning the individual/device a unique identifier value to further track. These tools enable real-time event receiving and forwarding of information to and from Epsilon's partners, including real-time sharing of analytics data, thereby giving marketers continued visibility into user behavior even if traditional client-side tracking methods are blocked or inactive.

87.     Accordingly, when an individual interacts with a website or app that is partnered with Epsilon through these server-side integrations, the website or app transmits the user's activity (*e.g.*, running a search for running shoes, watching a video of a cruise vacation, reading an article on electric vehicles, etc.) to Epsilon for aggregation into COREid. This activity is then analyzed to update the profile with that individual's "interests and intentions" and "life stage events. thereby enhancing Epsilon's ability to target and track consumers across digital properties."[45]

88.     COREid makes use of real time and historic activity across all of an individual's devices that he or she uses in interacting with a website or application published by an Epsilon partner.

---

[43] https://www.epsilon.com/us/products-and-services/publishers.
[44] https://publishersupport.conversantmedia.com/integrations/ssapi-full.
[45] https://www.epsilon.com/us/products-and-services/identity-core-id?tab=casestudies.

89.     Epsilon thus harvests (and eventually monetizes) data reflecting an individual's social status, hobbies, or interests. But Epsilon also intercepts, collects, and aggregates for advertising purposes more invasive and outright disturbing categories of information, such as health and wellness data, including data reflecting consumers' specific health conditions, as well as data concerning an individual's attitudes, preferences, and propensity to engage in certain activities . These represent deeply personal and sensitive subjects and few, if any, consumers would want them collected and disseminated online.

90.     Epsilon claims that these profiles are "anonymized" since they are given an alphanumeric "Core ID" designation such as "4FE39281" internally. This is a dubious claim at best given the sheer volume of information contained within.

91.     Indeed, due to the highly-detailed, individual-specific data that Epsilon collects, analyzes and shares, individuals are "anonymized" in name only. Epsilon tracks and assigns persistent identifiers to every individual in Epsilon's databases, along with amassing and tracking detailed data concerning the individual's preferences, residence, workplace, devices and more. The information that Epsilon collects, both from its own Tracking Tools and obtained from third parties, is sufficient on its own to identify specific individuals.

92.     In fact, the data that Epsilon collects, tracks, and uses concerning individuals is so detailed that Epsilon represents that entities and individuals that purchase and/or use the CoreID data can "see a person behind the numbers," such as an individual who fits the description of being "a 34-year-old married female with two children," who is "active in yoga, Pilates and running. Often tries different organic diet plans. Has allergies and high blood pressure, and owns dental insurance," is a "homeowner [with] a household income of $125K–$150K and household net worth of $250K–$500K. Active investor. [has] two cars[]: a 2015 Audi and a 2016 Chrysler

Pacifica" "spent $5,000+ with United Airlines this year. High spender at Brooks Brothers and Marshalls. Frequently buys Tide, Crest and Nature's Way vitamins" "is in the market for a new luxury car. Likely to purchase organic food, switch phone providers, purchase multi-policy insurance, take a family vacation and donate to children's causes."[46] Collecting and disseminating such minute details concerning an individual does not comport with the traditional definition of "anonymous."

93. In addition to Epsilon using COREid for its own ad service purposes, Epsilon's partners can also make direct use of the COREid service by synchronizing their own internal databases with the COREid database. In this process, the partner can update the consumer profiles that the partners maintain of their own former, current, and prospective customers. Epsilon maintains that data shared with COREid during this process is not shared with the main COREid database or other partners. Instead, a separate "instance" (*i.e.* virtual division or partition) is created for this process for each partner. However, this claimed division is unique to this process involving the partners' internal databases and data stores containing their propriety customer information. Despite the claimed partition, COREid is still automatically and constantly fed activity info from the partners' webpages and applications for its CORE ID profiles.[47]

---

[46] https://www.epsilon.com/us/products-and-services/data.
[47] https://www.epsilon.com/us/products-and-services/identity-core-id?tab=casestudies.

*Figure 8: Screenshot taken from Epsilon's website.[48]*

## C. Epsilon's Monetization of User Data through Ad Service

94. Epsilon's business is centered around delivering micro-targeted digital advertisements to consumers, with a high degree of precision in consumer targeting (via COREid) *and* ad-timing accomplished through the use of its databases.

95. To understand Epsilon's business, a basic overview of digital advertising and the parties involved are required:

(a) Ad Inventory refers to digital spaces than can display ads, such as places for banner ads on the margins of webpages, video ads that play before and after online videos, and pop-up ads on mobile and computer applications.

(b) Ad Exchange refers a digital marketplace that enables advertisers and ad space sellers (*e.g.*, app developers selling loading screen space, webpage publishers selling banner and sidebar ad space) to buy, sell, and trade ad inventory.

(c) Real-Time Bidding (RTB) is the digital advertising process in which advertisers engage in a simultaneous and instantaneous "auction" with the publisher's

---

[48] *Id.*

platform, and the highest bidder wins the right to display a specific advertisement on an specific individual's device.

96.     The entities that control the Ad Inventory: website publishers, video hosting services, and mobile application developers sell their Ad Inventory to entities looking to advertise. Virtually anyone looking to place any kind of advertising (for products or political and social causes, for example) can buy Ad Inventory from an Ad Exchange, typically using Demand-Side Platforms. Ads are delivered directly to user devices and other advertising spaces made available by Ad Inventory sellers through a Supply-Side Platform.

97.     Due to the interactive nature of online media, online advertising is usually microtargeted to individual website visitors, video viewers, or app users. This targeting is accomplished, in real-time, through a process known as "Ad Service" to determine which specific ad is displayed in which inventory, *i.e.*, which ad should be shown to a specific individual at that specific point in time. This is accomplished using vast quantities of information collected from consumers.[49]

---

[49] As an example, a company that wishes to advertise women's designer exercise shoes will log-on to an ad exchange and purchase ad inventory from publishers that control websites, video hosting services, and applications that are known, based on data, to be used extensively by women (*e.g.*, the *Glamour* magazine's website, YouTube channel, and app). When it purchases this ad inventory, the company will identify the type of individual that it wishes to target: fashion-minded women with an active lifestyle or interest in fitness. The ad exchange will then utilize data management platforms to begin ad service. So, when a consumer visits the *Glamour* magazine website, the exchange's data management platform will identify that consumer through browser cookies and/or mobile device identifies and pull and combine known data about the consumer (such as their gender, interests, occupation, other websites visited, and media consumed). If for example, the data management platform finds that the consumer is a female, frequently visits fitness websites and watches fitness videos, reads blogs about fashion, and regularly visits a gym (based on collected location data) then the ad exchange will place banner ads for the high-fashion exercise shoes on the website for the consumer to view (and hopefully interact with).

98.     In a typical online advertising campaign, publishers will sell placements with payment based on the number of impressions (when an ad is served through an app, webpage or other media) or conversions (when a user interacts with an ad following an impression).

99.     Epsilon's primary business is in ad service and it boasts about the precision of its ad placements and the resultant high conversion rate, all enabled by its COREid service and its database of 255 million individuals.[50]

100.    Epsilon's real-time bidding process occurs both 1) through its partnership with The Trade Desk's DSP[51] in which the information in Epsilon's COREid is used to inform decisions on whether to place a bid for an advertising slot on open auction and, if so, how much to bid, and 2) through Epsilon's own ad exchange, the CORE Private Exchange, through which Epsilon itself facilitates ad auctions and ad placement with advertisers and a select set of publishers that have chosen to work directly with Epsilon utilizing the data contained in its COREid identifier.

101.    The COREid profiles allows Epsilon's partners to target specific individuals based on demographics, interests, behavior, and location at the most opportune time.

102.    The categories and consumer-specific information that Epsilon monetizes are comprehensive and include:

(a)     **Demographic & Lifestyle** (*e.g.*, a 34-year-old married female with two children).

(b)     **Health & Wellness** (*e.g.*, the individual is active in yoga, Pilates and running. Often tries different organic diet plans. Has allergies and high blood pressure, and owns dental insurance).

---

[50] https://www.epsilon.com/us/products-and-services/marketing-services.
[51] https://www.epsilon.com/us/about-us/pressroom/publicis-groupe-and-the-trade-desk-join-forces-to-champion-new-approach-to-privacy-first-identity-and-personalization-at-scale-in-a-cookie-less-world.

(c) **Finances & Wealth** (*e.g.*, the individual is a homeowner, has a household income of $125K–$150K and household net worth of $250K–$500K. Active investor. There are two cars in her household: a 2015 Audi and a 2016 Chrysler Pacifica).

(d) **Merchant-Level Purchase Data** (*e.g.*, the individual spent $5,000+ with United Airlines this year. High spender at Brooks Brothers and Marshalls. Frequently buys Tide, Crest and Nature's Way vitamins).

(e) **Propensity & Intent** (*e.g.*, the individual is in the market for a new luxury car. Likely to purchase organic food, switch phone providers, purchase multi-policy insurance, take a family vacation and donate to children's causes).

(f) **Attitudes & Preferences** (*e.g.*, the individual is a tech early adopter, frequently shops at Amazon and other online retailers).

(g) **Abacus Cooperative Purchase Data** (*e.g.*, the individuals a heavy purchaser of mid-ticket female apparel, spending $1,000+ the past year across 15 transactions).[52]

103. Epsilon heavily emphasizes the benefits of the precision enabled by its data driven approach to ad service, and proudly features several notable marketing success stories.

---

[52] https://www.epsilon.com/us/products-and-services/data.

104.     For example, Epsilon claims that this information is collected and compiled to deliver targeted advertising at the most opportune moments to promote interaction. For example, Epsilon asserts that it will not serve ads for running shoes to a consumer if that consumer recently purchased that type of shoe with COREid providing this kind of "crucial" consumer information.

*Figure 9: Screenshot taken from Epsilon's website.[53]*

---

[53] https://www.epsilon.com/us/products-and-services/epsilon-digital.



*Figure 10: Screenshot taken from Epsilon's website.[54]*

**D. Epsilon Obtains Consumers' Data without Consent**

105.    Epsilon's North American Privacy Policy that describes the highly sensitive information it collects through its partners, third parties, and users directly as well as the commercial purposes, including advertising, for which this data is used. The Policy also states that

---

[54] https://www.epsilon.com/us/products-and-services/marketing-services.

individuals have the right to request access to, correction of, and deletion of data. The Policy also states that individuals have the right to opt-out of the sale of their personal data.[55]

106. However, Epsilon's data collection is omnipresent, constant, and takes place in the background, out of sight and unheard. Indeed, Epsilon receives a constant stream of real time activity information when consumers interact with their partners' app or website. Few consumers would ever know or realize that their specific personal information and detailed records concerning the activities, movements, and preference are being sent to Epsilon in the first place.

107. As such, users, including Plaintiffs and Class Members, had no knowledge that while they were browsing websites or using mobile apps, that Epsilon—a company completely unrelated to the website and/or app developers—was intercepting not only their browsing and app usage (including the contents of their communications), but also their location as they used their phones and other devices.

108. Users, including Plaintiffs and Class Members, also had no knowledge that Epsilon was aggregating the trove of data it collected to build, in the form of the COREid database, highly-detailed and sensitive profiles containing individual users' demographic information, location information, physical movements, health information, ideological leaning, attitudes, wealth and spending information, and more (hereinafter, "Private Information").

109. Plaintiffs and Class Members did not consent to Epsilon's collection of their Private Information, its repackaging, and/or its monetization of that data.

110. By installing and using the Tracking Tools (such as the Dotomi web trackers, cookies, pixels, JavaScript tags, SDK data, and more) without Plaintiffs' and Class Members' prior consent and without a court order and by collecting the aforementioned information from its

---

[55] https://legal.epsilon.com/us/NA-products-privacy-policy.

partners, Epsilon violated CIPA 638.51(a). Epsilon also violated both Plaintiffs' and Class Members' right to privacy and the control of their Private Information. Epsilon enriched itself by collecting Plaintiffs' and Class Member's Private Information and using it for marketing, advertising, identity resolution, analytics, and similar services that it offers and profits from.

**E. Standing & Harm**

111.     Since America's founding, privacy has been a legally protected interest at the local, state and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271-72 (9th Cir. 2019) (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded as 'providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law").

112.     The invasion of privacy rights is a "concrete and particularized" injury sufficient to confer standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized").

113.     Plaintiffs allege that they and Class Members were personally injured when Epsilon impermissibly obtained their Private Information, including data sufficient to enable Epsilon to fingerprint users by, among other things, ascertaining their locations and tracking their website activities over time, and thus target users with advertisements tailored to their location and/or browsing history.

38

114. It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g., Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the Plaintiffs' consent involved a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F.Supp.3d 767, 784 (N.D. Cal. 2019) (dissemination to third parties of Plaintiffs' personal information is "sufficient to confer [Article III] standing").

115. Separate from an invasion-of-privacy harm, Plaintiffs also allege economic harm sufficient for Article III standing by alleging that user data carries financial value, and by alleging that Epsilon profited and continues to profit from the misappropriated Private Information.

116. Courts regularly find such allegations sufficient to confer standing on Plaintiffs alleging violations of their privacy rights under CIPA. *See, e.g.*, *Shah v. Fandom, Inc.* 754 F. Supp. 3d 924, 2024 WL 4539577 (N.D. Cal. Oct. 21, 2024) (Plaintiffs had standing based on allegations that "the collection of their IP addresses through the Trackers allows the third parties to obtain 'personally identifying, non anonymized information,' and that the IP addresses reveal geographical location and other personal information sufficient for third parties to conduct targeted advertising"); *Mirmalek v. Los Angeles Times Comm'ns LLC*, 2024 WL 5102709, at *4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educational Sys. Inc.,* 742 F. Supp. 3d 1072, 1078 (C.D. Cal. 2024) (Plaintiffs had standing based on allegations that defendant collected Plaintiffs' information, thereby constituting an invasion of privacy which is an "actionable injur[y]").

117. Epsilon's interception, disclosure, and monetization of Private Information harmed Plaintiffs and the Class. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data, and estimates for 2022 were as high as $434 per user, constituting over $200 billion industry wide.

118. Epsilon's interception, disclosure, and monetization of consumer data harmed Plaintiffs and the Class. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data, and estimates for 2022 were as high as $434 per user, constituting over $200 billion industry wide.

119. The value of certain personal data in particular is well-known. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data, observing that the market for this data is both lucrative and a significant risk to privacy.

120. There is also a market for data in which consumers can participate. Private Information has been recognized by courts as extremely valuable. See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

121. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

122. Meta also has paid users for their digital information, including browsing history. Until 2019, Meta ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

123. Private Information has private value beyond its use as a bare commodity. The value of Private Information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information systems, management, health care, and marketing. This research has approached the valuation of Private Information from multiple perspectives:

      (a)     The amount one would accept to relinquish their data;

      (b)     The amount one would spend to protect their data;

      (c)     The potential harm from data exposure; and

      (d)     The benefit a data holder could gain from acquiring data.

124. These approaches can be used to establish a set of data points for the reasonable estimation of the value of personal information and non-public medical information such as patient status.

125. In addition, numerous services exist that charge fees to monitor and remove Private Information from data brokers and search databases. For example, Privacy Bee charges $197 per year. Other similar services exist today, such as DeleteMe®, which removes information from all major data broker websites for $129 per year, DeleteMe™ which charges one-time fees ranging from $100 to $500 for search engine and data breach removals, Incogni.com which charges $179 per year to remove information from major data broker websites and search databases, and ReputationDefender, a service that charges $99 per year to remove personal information from various databases. These provide a baseline market valuation of Private Information.

126. Likewise, on information and belief, the Tracking Tools used by Defendant also may have transmitted AAID (Android Advertising ID), Router SSID, Hardware ID, IMEI (International Mobile Equipment Identity), and other persistent identifiers.

41

***Plaintiff David Freifeld***

127. From 2021 to the present, Plaintiff David Freifeld visited the Walgreens website while in Illinois, and he used that website to communicate information concerning prescription information and ultimately, to pick up the prescription.

128. Unbeknownst to Plaintiff Freifeld, Epsilon's Tracking Tools were loaded onto each page of the website.

129. When Plaintiff Freifeld visited the Walgreens website, Epsilon installed multiple separate cookies onto his browser and device.

130. Epsilon collected information about him, including the webpages he visited, his IP address, and fingerprint information about his device and browser, among others.

131. Defendant shared Plaintiff Freifeld's IP address, unique ID, previously collected information, and information about which pages of the Walgreens website he visited with every Partner Pixel to which it provided identity resolution.

132. Defendant compiled the information it collected into a profile on Plaintiff Freifeld and added the bolstered profile to its suite of data products described above.

133. Defendant also, by using the cookies loaded onto Plaintiff Freifeld's browser, tracked his future web browsing activity across the internet and assisted other Partner Pixels in tracking him and wiretapping his communications with websites and mobile apps.

134. Plaintiff Freifeld was unaware that Defendant was installing trackers on his browser, wiretapping his communications, aiding in the wiretapping of his communications, deanonymizing his personal data, or collecting, selling, and disclosing her personal data to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Freifeld have discovered these facts.

42

135. Plaintiff Freifeld did not provide his prior consent to Defendant to install trackers on his browser, wiretap his communications, aid in the wiretapping of his communications, deanonymize his personal data, or collect, sell, and disclose his personal data.

### Plaintiff Nitaya Mcgee

136. Plaintiff Nitaya McGee used websites and apps that had Epsilon's Tracking Tools embedded in them.

137. As a result of the conduct alleged herein, her sensitive Private Information was intercepted, received, and used by Epsilon without her knowledge or consent.

138. For example, Plaintiff McGee visited the Walgreen's website while in California, and she used that website to communicate Private Information concerning a prescription medication. She also used the website to place and track her online order for that medication.

139. Unbeknownst to Plaintiff McGee, Epsilon's Tracking Tools were loaded onto Walgreen's website. As a result, Epsilon tracked, intercepted, and collected her communications and personally identifiable information as she used the Walgreen's website.

140. Epsilon also collected, at minimum, Plaintiff McGee's IP address, device information, persistent identifiers, and other information.

141. Epsilon shared this information with additional third parties with whom it conducts business and used her Private Information to build out its identity resolution products and services.

142. Plaintiff McGee was unaware that Epsilon installed Tracking Tools on Walgreen's website because the Tracking Tools were and are completely invisible to ordinary website users.

143. Likewise, Plaintiff McGee was unaware that Epsilon installed its Tracking Tools on her browser, wiretapped her communications, deanonymized her Private Information, or that it collected, sold, and disclosed her Private Information to advertising technology companies, other

data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff McGee have discovered these facts.

144. Plaintiff McGee values her privacy and has a continuing interest in ensuring that future communications and her Private Information are protected and safeguarded from future unauthorized interception, collection, and disclosure.

### *Plaintiff Hannah Smith*

145. Plaintiff Hannah Smith is a California resident who visited websites and mobile applications with Defendant's tracking technology installed while in California, including as recently as July 2025.

146. Plaintiff Smith uses her computer and mobile phone to conduct a substantial portion of her affairs, including shopping, banking and investing, streaming content, and tracking information related to her health.

147. On August 7, 2025, Plaintiff Smith received a data access request response that included a link to an access report for the digital identifiers collected from Plaintiff Smith by Defendant, which indicated that that the company had tracked, compiled and analyzed her personal information, including web browsing activity, app activity, and purchases into data "segments" and to sell access to information about her (1) to other data brokers and advertisers and (2) to the highest advertising bidder through nearly instantaneous Real-Time Bidding ("RTB") auctions. On information and belief, Defendant continues to track Plaintiff Smith's activity on websites and apps, enrich the profile it maintains on her, and make access to her personal information available to third parties without her consent. The data request file organized Plaintiff Smith's information into several categories, each of which give insight into the amount of data collected on her.

44

**Cookie-Based Information**

148.    The data request file shows that Defendant, using a unique Dotomi identifier, tracked the specific web activity of Plaintiff between March 2025 and June 2025, providing a sample of the persistent tracking occurring over years. The file contains a list of each website where she was tracked and the date of her first and last visit to that website. The list included, but is not limited to:

a)  Vanguard.com

b)  Cdw.com

c)  Lenscrafters.com

d)  Verizon.com

e)  Marriot.com

f)  Lowes.com

**Characteristic Information**

149.    The data request file also contained dozens of assumptions Defendant made about Plaintiff Smith, which are sold to target advertisements to her. Defendant associated Plaintiff Smith with characteristics related to her:

a)  Occupation and income level

b)  Net worth

c)  Health and fitness needs

d)  Credit card brand

e)  Shopping habits

f)  Media consumption habits

**Commercial Information**

150. The data request file also contains a section labelled "Commercial Information," which is a title-by-title list of specific streaming content Plaintiff Smith viewed on websites with Defendant's trackers installed.

**Purchase Information**

151. The data request file also includes a list of websites visited by Plaintiff Smith where she might have made a purchase. This list operates as a tracker of purchases made and includes the number of confirmed purchases made and the date of the first and latest purchase on the site. These sites include, but are not limited to:

a) Hertz.com

b) Macy's.com

c) Ulta.com

d) Walgreens.com

**Dotomi Identifiers**

152. The data request file also includes a list of the numerous Dotomi ID numbers, assigned when the cookies are loaded onto Plaintiff Smith's browser, as described above, that were associated with Plaintiff Smith's identity. The amount of identifiers listed indicate Plaintiff Smith has been tracked by Defendant over multiple years.

**IP Addresses**

153. The data request file contains a list of every IP address associated with Plaintiff Smith's identity, proving that the IP addresses collected by Defendant are, in fact, personally identifiable.

46

154. The list of IP addresses is extensive, covering over 20 pages, indicating Defendant has matched the IP address for nearly every device and wireless router Plaintiff Smith has ever used with her identity.

155. In order to obtain this information, Defendant also intercepted Plaintiff Smith's selections on and communications with the websites at issue.

156. These interceptions happened in real time as Plaintiff Smith made the selections and entered information into the various websites.

157. Defendant, as evidenced by the data request file, compiled this information into a profile on Plaintiff Smith.

158. Plaintiff Smith was unaware that Defendant was installing trackers on her browser, wiretapping her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor could Plaintiff Smith have discovered these facts.

159. Plaintiff Smith did not provide her prior consent to Defendant to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendant. Nor did Defendant obtain a court order to do the same.

160. Plaintiff Smith has, therefore, had her privacy invaded by Defendant's violations of the ECPA and CIPA §§ 631(a) and 638.51(a), and Defendant has been unjustly enriched by the disclosure and sale of the improperly collected data concerning Plaintiff Smith.

## TOLLING

161.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their Private Information was intercepted, recorded, and monetized by Epsilon.

## CLASS ACTION ALLEGATIONS

162.    **Class Definition:** Plaintiffs bring this action on behalf of themselves and other similarly situated individuals defined as follows:

> **Nationwide Class:** United States citizens who used, visited, or accessed a website or mobile app on which an Epsilon Tracking Tool or accessed a website or mobile app of an Epsilon partner, and whose IP addresses, browser data, device data, and/or other personal information and communications were collected by and disclosed to Epsilon via its Tracking Tools or via its partners.

> **Illinois Class:** Illinois residents who used, visited, or accessed a website or mobile app on which an Epsilon Tracking Tool was present or accessed a website or mobile app of an Epsilon partner, and whose IP addresses, browser data, device data, and/or other personal information and communications were collected by and disclosed to Epsilon via its Tracking Tools or via its partners

> **California Class:** California residents who used, visited, or accessed a website or mobile app on which an Epsilon Tracking Tool was present or accessed a website or mobile app of an Epsilon partner, and whose IP addresses, browser data, device data, and/or other personal information and communications were collected by and disclosed to Epsilon via its Tracking Tools or via its partners.

163.    Plaintiffs reserve the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

164.    The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

165. Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

166. Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently. However, it is estimated that there are millions of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records.

167. Typicality. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs used apps and websites on which Defendant's Tracking Tools were embedded and had their Private Information, intercepted, collected, and aggregated to build detailed profiles of their online and offline activities, then later monetized by Defendant in various ways, including through its sale to third parties and use in the delivery of highly targeted advertisements, without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members.

168. Adequacy. Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

169.  <u>Common Questions of Law and Fact Predominate/Well Defined Community of</u> <u>Interest</u>. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

(a)  Whether Epsilon intentionally tapped the lines of internet communication between Class Members and third parties;

(b)  Whether the Tracking Tools surreptitiously tracked Private Information and related communications; and simultaneously disclose(d) that information to Meta, Google, and/or other third parties;

(c)  Whether Epsilon invaded Class Members' privacy and violated their privacy rights through its use of Tracking Tools, its creation and supplementation of COREid profiles using the Private Information gathered through Tracking Tools and other means, through its use of that Private Information to facilitate its internet marketing businesses, and/or through its disclosures of Private Information to third parties for profit;

(d)  Whether Plaintiffs and Class Members are entitled to damages under the ECPA, CIPA, or any other relevant statute, including those cited herein;

(e)  Whether Epsilon's actions violated state consumer protection statutes, including but not limited to California's Unfair Competition Law; and

(f)  Whether Epsilon's conduct harmed Class Members.

170.  <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would

50

engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2510, *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

171. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

172. The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

173. In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

174. The ECPA protects both sending and receipt of communications.

175. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

176. The transmissions of Plaintiffs' Private Information via the mobile applications and websites on which Epsilon's Tracking Tools are embedded qualify as "communications" under the ECPA's definition in 18 U.S.C. § 2510(12).

177. **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and the mobile applications and websites on which Epsilon's Tracking Tools are embedded are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

178. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

179. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

180. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a) Plaintiffs' and Class Members' browsers;

(b) Plaintiffs' and Class Members' computing devices and mobile devices;

(c) Epsilon's web-servers; and

(d) The Tracking Tools deployed by Epsilon to effectuate the sending and acquisition of communications and the Private Information contained therein.

181. When Plaintiffs and Class Members interacted with the mobile applications and websites on which Epsilon's Tracking Tools are embedded, Epsilon, through the Tracking Tools, contemporaneously and intentionally disclosed, used, and redirected, and endeavored to disclose, use, and redirect, the contents of Plaintiffs' and Class Members' electronic communications to itself—and, later, to third parties—without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c)-(d).

182. Epsilon's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs and Class Members.

183. By intentionally capturing the electronic communications of Plaintiffs and Class Members and the contents thereof, including Private Information, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Epsilon violated 18 U.S.C. § 2511(1)(c)-(d).

184. Epsilon intentionally used the wire or electronic communications to increase its profit margins, and it specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' communications and other information for Epsilon's financial gain.

185. Additionally, Epsilon intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

186. Epsilon was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

187. Plaintiffs and Class Members did not authorize Epsilon to acquire the content(s) of their communications via the Tracking Tools for purposes of invading their privacy.

188. Any purported consent Epsilon received from Plaintiffs and Class Members was not valid.

189. **Unauthorized Purpose**. Epsilon intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State – namely, violations of HIPAA, breaches of confidence, invasion of privacy, among others.

190. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

191. To the extent Epsilon claims it is a "party to the communication" with respect to Plaintiffs' and Class Members' communications (it was not), its simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

192. More specifically, Epsilon's acquisition of Plaintiffs' and Class Members' communications, which were used and disclosed to unauthorized third parties, was done for the purpose of committing criminal and tortious acts in violation of the laws of the United States and the individual States, including:

    a)     15 U.S.C. § 45;

    b)     Cal. Penal Code § 631, *et seq.*;

    c)     Cal. Penal Code §638.51(a);

    d)     Cal. Bus. & Prof. Code § 17200; and

e)     The common law and other statutory causes of action alleged herein.

193.    "The association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Riganian v. Liveramp Holdings, Inc.*, __ F.Supp.3d __, 2025 WL 2021802, at *9-10 (N.D. Cal. July 18, 2025); *Marden v. LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

194.    Plaintiffs and Class Members did not authorize Epsilon to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy. Plaintiffs and Class members had a reasonable expectation that Epsilon would not intercept their communications and sell their data to third parties without their knowledge or consent.

195.    Epsilon accessed, obtained, and disclosed Plaintiffs' and Class Members' Private Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

196.    As such, Epsilon cannot viably claim any exception to ECPA liability.

197.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Epsilon's invasion of privacy.

198.    As a result of Epsilon's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**SECOND CAUSE OF ACTION**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Nationwide Class)**

199.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

200.    Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with third parties.

201.    Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and Private Information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

202.    Epsilon's conduct of placing Tracking Tools on and in websites and apps to intercept, collect, and use information concerning Plaintiffs and Class Members, as well as its collecting of additional information and data from third parties, to create detailed and comprehensive profiles of Plaintiffs and Class members, and the dissemination of those profiles and data to third parties—all without the consent or authorization of Plaintiffs and Class Members—intentionally invaded Plaintiffs' and Class Members' privacy rights, as well as intruded upon Plaintiffs' and Class Members' seclusion

203.    Epsilon's disclosure of the substance and nature of Plaintiffs' and Class Members' communications to third parties without their knowledge and consent is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

204.    Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information and other Private Information would remain

56

confidential, and that Epsilon would not install: (1) wiretaps to secretly transmit their communications to unauthorized third parties; or (2) pin registers and/or trap and trace devices.

205. Plaintiffs' and Class Members did not and could not authorize Epsilon to intercept data on every aspect of their lives and activities.

206. The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

    a.    Epsilon's conduct of intercepting, collecting and using Plaintiffs' and Class Members' internet and app communications and activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them;

    b.    Epsilon's conduct of combining the information collected on websites and apps with offline information also gathered on individuals to create detailed profiles concerning Plaintiffs and Class Members; and

    c.    Epsilon's conduct of selling or otherwise disclosing the profiles and data that it amassed concerning Plaintiffs and Class Members to unknown third parties for use in the real-time-bidding process, which likewise violates Plaintiffs' and Class Members' common law right to privacy and the control of their personal information

207. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

208. Plaintiffs and Class Members have been damaged as a direct and proximate result of Epsilon's invasion of their privacy and are entitled to just compensation, including monetary damages.

209. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests.

210. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Epsilon's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Epsilon from engaging in such conduct in the future.

211. Plaintiffs also seek such other relief as the Court may deem just and proper.

**THIRD CAUSE OF ACTION**
**Common Law Invasion of Privacy – Publication of Private Facts**
**(On Behalf of Plaintiffs and the Nationwide Class)**

212. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

213. Plaintiffs' and Class Members' private information, including their communications and Private Information, are private facts that Epsilon acquired without the knowledge or consent of Plaintiffs and Class Members.

214. Epsilon gave publicity to Plaintiffs' and Class Members' Private Information and the content of their communications by sharing them with unauthorized third parties, including but not limited to advertisers and other entities that build massive databases of individual consumer profiles from which to sell targeted advertising and make further disseminations.

215. Plaintiffs and Class Members did not know that Epsilon was using Tracking Tools to intercept, track, use and disclose their Private Information and communications.

216. Epsilon's surreptitious tracking and commoditization of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

217. In disseminating Plaintiffs' and Class Members' Private Information without their consent, Epsilon acted with oppression, fraud, or malice.

218. Plaintiffs and Class Members have been damaged by the publication of their Private Information and are entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment (Quasi-Contract Claim for Restitution and Disgorgement) or,**
**Alternatively, Breach of Contract**
**(On Behalf of Plaintiffs and the Nationwide Class)**

219. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

220. Plaintiffs and Class Members unwittingly conferred a benefit upon Defendant.

221. Defendant intercepted, collected and aggregated Plaintiffs' and Class Members' Private Information, without Plaintiffs' and Class Members' consent, to build products such as COREid and develop services it sold to third parties for profit.

222. Defendant was enriched when it utilized Plaintiffs' and Class Members' Private Information, gathered without consent, for its own financial advantage.

223. In exchange for Plaintiffs' and Class Members' loss of privacy and the financial benefits Defendant enjoyed as a result thereof, including, but not limited to, profits from the sale and other use of Private Information and the COREid profiles that information was used to build, as well as other products and services derived therefrom, Plaintiffs and Class Members received nothing.

224. Plaintiffs and Class Members received no benefit from this use and monetization of their Private Information. Plaintiffs and Class Members would have expected to receive compensation for providing this data to a data broker who uses such data for profit. But, because Plaintiffs and Class Members did not consent to Defendant's collection and sale of Plaintiffs' and

Class Members' Private Information, they could not and do not benefit from such practices. It is therefore inequitable for Defendant to retain any profit from such collection and sale without payment to Plaintiffs and Class Members for the value of their Private Information.

225. Alternatively, to the extent Defendant successfully asserts that any terms of service from a binding contract that sufficiently defines the parties' rights regarding Defendant's interception, collection and use of Plaintiffs' and Class Members' Private Information, thereby rendering a claim for unjust enrichment unavailable (which Plaintiffs deny in the first instance), then Plaintiffs allege that Defendant's conduct constitutes a breach of any such binding contract, including, but not limited to, the covenant of good faith and fair dealing implied into every contract. Defendant did not adequately disclose prior to accessing, collecting and later selling Plaintiffs' and Class Members' Private Information that it would or could be used and sold to undisclosed third parties.

226. By virtue of Defendant's conduct as alleged herein, including the monetization and sale of Plaintiffs' and Class Members' Private Information without adequate disclosure beforehand, Defendant breached the covenant of good faith and fair dealing implied into every contract, including any applicable terms of service.

227. Defendant is therefore liable to Plaintiffs and Class Members for restitution in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically the value to Defendant of the Private Information that it wrongfully intercepted, collected, used, and sold to third parties, and the profits Defendant received or is currently receiving from the use and sale of that Private Information.

**FIFTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631, *et seq.***
**(On Behalf of Plaintiffs McGee and Smith and the California Class)**

228.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

229.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose.

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

230.    California Penal Code § 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

231.    Under CIPA, Epsilon must show it had the consent of all parties to a communication.

232.    At all relevant times, Epsilon willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications between Plaintiffs and Class Members, on the one hand, and the

third-party websites and apps, on the other hand, while the communications were in transit or being sent to or from any place within California.

233. At all relevant times, Epsilon aided, employed, agreed with, and conspired with third parties—the websites and apps that Plaintiffs and Class Members communicated with—to track and intercept Plaintiffs' and Class Members' internet communications. These communications were transmitted to and intercepted by Epsilon during the communication and without the knowledge, authorization, or consent of Plaintiffs and Class Members.

234. Epsilon intentionally inserted an electronic listening device onto Plaintiffs' and Class Members' web browsers and mobile devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications to Epsilon—which constitutes a "person" within the meaning of the statute.

235. Epsilon willingly facilitated the interception and collection of Plaintiffs' and Class Members' Private Information by embedding its Tracking Tools into the third-party websites and apps.

236. Moreover, Epsilon's Tracking Tools are: (1) completely invisible to website and app users; and (2) Epsilon has full control over these tools, including where they are embedded, what information is tracked and transmitted, and how events are categorized prior to their transmission.

237. At all relevant times, Epsilon used the intercepted communications by, at a minimum, building comprehensive and detailed profiles specific to the individual, and offering the profiles for sale and other disclosure to third parties.

238. Epsilon's Tracking Tools constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

239. Epsilon failed to disclose its use of the Tracking Tools to specifically track and automatically and simultaneously intercept Plaintiffs' and Class Members' communications with third parties.

240. Epsilon's Tracking Tools intercept and transmit user's actions and communications contemporaneously as the user initiates each communication. As a result, the user's communications are intercepted in transit to the intended recipient.

241. Epsilon violated CIPA by intercepting and receiving individuals' online communications in real time as they were made.

242. By doing so, as well as by later disclosing Plaintiffs' and Class Members' Private Information, Epsilon violated Plaintiffs' and Class Members statutorily protected right to privacy.

243. As a result of the above violations, and pursuant to CIPA Section 637.2, Epsilon is liable to Plaintiffs and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

244. Under the statute, Epsilon is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**SIXTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 638.51(a)**
**(On Behalf of Plaintiffs McGee and Smith and the California Class)**

245.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

246.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

247.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of the communication." Cal. Penal Code § 638.50(b).

248.    To the extent that the Tracking Tools do not intercept the "contents" of the communications between Plaintiffs and Class Members and the third-party websites and apps, the Tracking Tools constitute "pen registers" because they are device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information" from Plaintiffs and Class Members' electronic communications—to wit, the IP address, geolocation, device information, and other persistent identifiers associated with Plaintiffs' and Class members' digital devices. *Id.*

249.    At all relevant times, Epsilon installed the Tracking Tools—which are pen registers—onto Plaintiffs' and Class Members' browsers, and it used the Tracking Tools to collect Plaintiffs' and Class Members' addressing, routing, and signaling information.

250.    Epsilon intercepted, collected, and tracked the information obtained through the pen registers to track Plaintiffs and Class members across devices and as they move through both

the real and digital world, so that Epsilon could build comprehensive detailed profiles concerning each individual.

251. Plaintiffs and Class Members did not consent to Epsilon's installation or use of the Tracking Tools.

252. Epsilon did not obtain a court order to install or use the Tracking Tools.

253. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Epsilon's violations of CIPA § 638.51(a), and each seek statutory damages of $5,000 for each of Epsilon's violations of CIPA § 638.51(a).

**SEVENTH CAUSE OF ACTION**
**Violation of the Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiffs McGee and Smith and the California Class)**

254. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

255. California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

256. Epsilon engaged in unlawful business practices in connection with its interception, collection and aggregation—and later monetization and/or disclosure to unauthorized third parties— of Plaintiffs' and Class Members' Private Information, in violation of the UCL.

257. Epsilon's acts, omissions, and conduct, as alleged herein, constitute "business practices" within the meaning of the UCL.

258. Epsilon violated the "unlawful" prong of the UCL by violating, *inter alia*, Plaintiffs' and Class Members' constitutional rights to privacy, state and federal privacy statutes, and state consumer protection statutes.

65

259. Epsilon's acts, omissions, and conduct also violate the unfair prong of the UCL because those acts, omissions, and conduct offend public policy (including the federal and state privacy statutes and state consumer protection statutes, such as the ECPA and CIPA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury, including to Plaintiffs and Class Members.

260. The harm caused by Epsilon's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Epsilon's legitimate business interests other than Epsilon's conduct described herein.

261. As a result of Epsilon's violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiffs' and Class Members' Private Information is ongoing.

262. Plaintiffs and Class Members would not have used the services of the third-party websites and apps had they known Epsilon had installed Tracking Tools and was intercepting, collecting, and disclosing their Private Information to third parties.

263. The unauthorized access to Plaintiffs' and Class Members' Private Information has also diminished the value of that information.

264. In the alternative to those claims seeking remedies at law, Plaintiffs and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Epsilon's unlawful and unfair business practices.

## EIGHTH CAUSE OF ACTION
### Invasion of Privacy Under California's Constitution
### (On Behalf of Plaintiffs McGee and Smith and the California Class)

265. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

66

266.    Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, *and privacy*." The phrase "*and privacy*" was added by the "Privacy Initiative" adopted by California voters in 1972.

267.    The addition of the phrase "and privacy" occurred after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom. [56]

268.    This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measures of protection against this most modern threat to personal privacy:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian. [57]

---

[56] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).

[57] *Id.*

269. In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident. In contravention to the California Constitution and the reasonable expectations of privacy of California residents, Epsilon "stockpil[es] unnecessary information about [Class members] and [] misus[es]information gathered for one purpose in order to serve other purposes," creating "cradle-to-grave" profiles of Class members.

270. Plaintiffs and Class Members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of Private Information. The reality of modern life increasingly requires that much of our daily activities are conducted online—Plaintiffs and Class Members have no practical choice or ability but to conduct their daily lives substantially in the digital world, connected to the Internet. The necessary engagement with the digital world makes Plaintiffs' and Class Members' private lives susceptible to unlawful observation and recording, capable of yielding a comprehensive and intrusive chronicle of Plaintiffs' and Class Members' lives. If Plaintiffs and Class Members cannot have a reasonable expectation of privacy in the conduct of their lives online and the digital transmission of their Private Information, they can have no reasonable expectation of privacy for virtually any facet of their lives.

271. Epsilon, in violation of Plaintiffs' and Class Members' reasonable expectation of privacy, intercepts, collects, tracks, and compiles their internet activity and communications, and monetizes that data as alleged herein.

272. By using its Tracking Tools and collecting others' sensitive and personal Private Information to build and monetize highly detailed profiles regarding Plaintiffs and Class members,

Epsilon intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

273. Epsilon also collects and analyzes Plaintiffs' and Class Members' real-world offline activity and compiles computerized records of those activities. Plaintiffs and Class Members do not and cannot know which specific real-world offline activities Epsilon may or may not be collecting and analyzing and adding to the digital dossiers it compiles on them.

274. The nature and volume of the data collected is such that Epsilon's practice of compiling comprehensive identity profiles violates Plaintiffs' and Class Members' reasonable expectation of privacy. Technological advances, such as Epsilon's use of Tracking Tools to compile internet activity and electronic communications, provide Epsilon with the means to assemble a comprehensive chronicle of Plaintiffs' and Class Members' lives heretofore unseen. Epsilon collects and compiles personal information such as Plaintiffs' and Class Members' names, postal addresses, email addresses, phone numbers, cookies, mobile device IDs, and web browsing information and activities. Such information is "personal information" under California law, which defines personal information as including "[i]nternet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

275. Plaintiffs and Class Members had a reasonable expectation that their communications, identity, movements and other Private Information would remain confidential, and that Epsilon would not install wiretaps, pin registers, and/or trap and trace devices to secretly transmit their communications and Private Information.

276. Plaintiffs and Class Members did not authorize Epsilon to transmit their Private Information to third parties, nor did they consent to allowing Epsilon or other third parties to intercept, receive, and view those communications.

277. This invasion of privacy is serious in nature, scope, and impact because it relates to Private Information, including private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the privacy right, specifically including the following:

      a.    Epsilon engages in dragnet-style collection and interception of Plaintiffs' and Class Members' Internet activity, including their communications with websites and apps, without their consent;

      b.    Epsilon also collects details about Plaintiffs' and Class Members' *offline* activities. By its very nature, Plaintiffs and Class Members cannot be aware of this; and

      c.    Epsilon creates comprehensive identity profiles based on this online and offline data, which constitute precisely the sort of "cradle-to-grave profiles" the right to privacy under the California Constitution was created to constrain.

278. Epsilon's amassing of electronic information reflecting highly detailed aspects of Plaintiffs' and Class Members' lives into dossiers, both directly and through providing access to its COREid, for future or present use, is in and of itself a violation of Plaintiffs' and Class Members' right to privacy in light of the serious risk these dossiers pose to their autonomy. Additionally, these dossiers are and can be used to further invade Plaintiffs' privacy by, *inter alia*, allowing third parties to learn intimate details of Plaintiffs' and Class Members' lives, and target them for advertising, political, and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them. Additionally, as described above, the social harms posed by Epsilon's

conduct impair not only individual autonomy, but also the collective autonomy of Class Members, and autonomy is essential to the proper functioning of democratic republics.

279.    As a result of Epsilon's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

280.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Epsilon's invasion of their privacy and are entitled to just compensation, including monetary damages.

281.    Plaintiffs and Class Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

282.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Epsilon's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights.

283.    Such damages are needed to deter Epsilon from engaging in such conduct in the future.

284.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**NINTH CAUSE OF ACTION**
**VIOLATION OF ILLINOIS EAVESDROPPING STATUTE**
**720 Ill. Comp. Stat. 5/14,** *et seq.*
**(On Behalf of Plaintiff Freifeld and the Illinois Class)**

285.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

286.    The Eavesdropping Article of the Illinois Criminal Code (the "Illinois Eavesdropping Statute" or "IES") states that it is a felony for any person to knowingly and intentionally "use[] an eavesdropping devise, in a surreptitious manner, for the purpose of transmitting or recording all or

part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation."

287. The IES also states that it is a felony for any person to knowingly and intentionally "use[] or disclose[] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties."

288. For purposes of the IES, "eavesdropping device" means "any device capable of being used to hear or record oral conversation or intercept or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means."

289. For purposes of the IES, "surreptitious" means "obtained or made by stealth or deception, or executed through secrecy or concealment."

290. For purposes of the IES, "private electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation. . . . Electronic communication does include any communication from a tracking device."

291. "A reasonable expectation shall include any expectation recognized by law, including, but not limited to, an expectation derived from a privilege, immunity, or right established by common law, Supreme Court rule, or the Illinois or United States Constitution."

72

292. Epsilon intentionally recorded and/or acquired Plaintiffs' and Class Members' private electronic communications in Illinois, without the consent of Plaintiffs and Class Members, using the Tracking Tools embedded in third-party mobile apps and websites.

293. Epsilon intentionally recorded and/or acquired Plaintiffs' and Class Members' private electronic communications and the Private Information contained therein for the purpose of building products such as COREid and developing services it sold to third parties for profit, without the knowledge, consent, or written authorization of Plaintiffs or the Class.

294. Plaintiffs' and Class Members' communications that were intercepted by Epsilon and which took place in Illinois, and constitute private conversations, communications, and information.

295. Plaintiffs and the Class had a reasonable expectation of privacy in their communications with third-party websites and mobile apps, and a reasonable expectation that those communications would not be intercepted and recorded by Epsilon.

296. Plaintiffs and the Class communicated sensitive Private Information that they did not intend for Epsilon to intercept, receive and access.

297. Plaintiffs and the Class have a reasonable expectation that Epsilon would not disclose Private Information and confidential communications to third parties without Plaintiffs' or Class Members' authorization, consent, or knowledge.

298. Plaintiffs and the Class were unaware that their Private Information was being surreptitiously recorded by Epsilon, and later monetized and disclosed to unauthorized third parties, as they communicated with third-party websites and mobile apps.

299. Under the IES, "[a]ny or all parties to any conversation or electronic communication upon which eavesdropping is practices contrary to this Article shall be entitled to the following remedies: (a) [t]o an injunction by the circuit court prohibiting further eavesdropping by the

73

eavesdropper and by or on behalf of his principal, or either; (b) [t]o all actual damages against the eavesdropper or his principal or both; [t]o any punitive damages which may be awarded by the court or by a jury. . . .”

300. The eavesdropping devices used in this case include, but are not limited to, the Tracking Tools described herein, as well as the third-party websites and mobile apps in which the tracking Tools were embedded..

301. The eavesdropping devices outlined above are not excluded “tracking devices” as that term is used in the IES, 720 ILCS 5/14-1(e), to the extent that they perform functions other than collection of geo-locational data.

302. Epsilon is a “person” under the IES.

303. Under the IES, Plaintiffs and Class Members are entitled to injunctive relief prohibiting further eavesdropping by Epsilon, actual damages, and punitive damages.

304. Epsilon's violations of the IES caused Plaintiffs and the Class the following damages:

a. Sensitive and confidential Private Information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Epsilon eroded the essential confidential nature of Private Information, including protected health information;

c. Epsilon took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

D. Epsilon's actions diminished the value of Plaintiffs' and Class Members' personal information.

305. Plaintiffs also seek such other relief as the Court may deem just and proper.

**TENTH CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 Ill. Comp. Stat. §§ 505, *et seq*.**
**(On Behalf of Plaintiff Freifeld and the Illinois Class)**

306. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

307. Epsilon is a "person" as defined by 815 Ill. Comp. Stat. § 505/1(c).

308. Illinois Plaintiffs and Class Members are "consumers" as defined by 815 Ill. Comp. Stat. § 505/1(e).

309. Epsilon's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

310. Epsilon's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include:

a. Intercepting, collecting, using, and selling Plaintiffs' Class Members' Private Information and communications without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Epsilons were intercepting, collecting, using, and monetizing Plaintiffs' and Class Members' Private Information to other third parties for its own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that Epsilon and other parties collected, manipulated, used, and sold Plaintiffs' and Class Members' Private Information for its own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of the Tracking Tools embedded in third-party websites and mobile apps; AND

e. Failing to comply with common law and/or statutory duties pertaining to the privacy of Plaintiffs' and Class Members' Private Information.

311. Epsilon acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Plaintiffs' and Class Members' rights, because Epsilon intentionally intercepted, collected, used, and monetized Plaintiffs' and Class Members' Private Information without obtaining their consent. The fact that Epsilon intercepted, collected, used, and monetized their Private Information was material to Plaintiffs and Class Members. This is a fact that reasonable consumers would consider important when choosing to use a mobile app or website.

312. Plaintiffs and Class Members were deceived and/or could reasonably be expected to be deceived by Epsilon's misrepresentations and omissions regarding the existence and functionality of the Tracking Tools, the security and privacy of their Private Information to their detriment.

313. Epsilon intended to mislead Plaintiffs and Class Members and induce them to rely on their misrepresentations and omissions.

314. In the course of its business, Epsilon engaged in activities with a tendency or capacity to deceive.

315. Plaintiffs and the Class acted reasonably in relying on Epsilon's misrepresentations and omissions, the truth of which they could not have discovered.

316. Epsilon engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by inducing Plaintiffs and Class Members to provide their Private Information with knowledge that such data was obtained without their consent, and further using, selling, and disseminating their Private Information without their consent.

317. Epsilon also violated the Act by knowingly taking advantage of Plaintiffs' Class Members' inability to reasonably protect their interests, due to their lack of knowledge regarding Epsilon's practices, a fact of which Epsilon was aware.

318. Plaintiffs' and Class Members' Private Information has tangible value. As a direct and proximate result of Epsilon's unfair and deceptive acts and practices, Plaintiffs' and Class Members' Private Information is in the possession of third parties—who have used and will use such data for their commercial benefit.

319. As a direct and proximate result of Epsilon's unfair, unconscionable, and deceptive acts and practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Private Information; damage to and diminution of the value of their Private Information; the likelihood of future misuse of their Private Information; and economic harm stemming from the exploitation of their Private Information.

320. Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

### RELIEF REQUESTED

Plaintiffs, on behalf of herself and the proposed Class, respectfully requests that the Court grant the following relief:

(a) Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

(b) A declaratory judgement that Defendant violated: (1) the Electronic Communications Privacy Act; (2) the California Invasion of Privacy Act; (3)the Illinois Statute against Consumer Fraud and Deceptive Business Practices; 4) the Unfair Competition Law; (5) Plaintiffs' and Class Members' privacy rights as provided at common law, Illinois Privacy

Statutes, and pursuant to the California Constitution; and (6) Plaintiffs' and Class Members' other rights under common law;

(c)     An order enjoining Epsilon from engaging in the unlawful practices and illegal acts described herein; and

(d)     An order awarding Plaintiffs and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5) reasonable attorneys' fees and expenses and costs of suit pursuant to Cal. Code of Civil Procedure § 1021.5 and/or other applicable law; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Date: August 20, 2025                    Respectfully submitted,

*/s/ Daniel O Herrera*
Daniel O. Herrera
Nickolas J. Hagman
Nabihah Maqbool
**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
dherrera@caffertyclobes.com
nhagman@caffertyclobes.com
nmaqbool@caffertyclobes.com

William J. Edelman
Heather M. Lopez (SBN 354022)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: 865-247-0080
wedelman@milberg.com
hlopez@milberg.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (IL ARDC # 6337165)
Yitzchak Kopel (# 5117619)
Alec Leslie (# 6344855)
Max Roberts (# 5748165)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
ykopel@bursor.com
aleslie@bursor.com
mroberts@bursor.com

*Counsel for Plaintiffs and*
*the Putative Class*